UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                           :

DEBORAH WENNING and ANDRES CORREA,   :

                Plaintiffs,    :

         -v-           :

ON-SITE MANAGER, INC.,        :

              Defendant.   :

                           :
------------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/22/16

14 Civ. 9693 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

      Plaintiffs Deborah Wenning and Andres Correa each rented an apartment in New York

City until they agreed with their respective landlords to vacate. Those agreements led to the

entry, in New York City Housing Court, of judgments of possession in favor of plaintiffs'

landlords. Later, defendant On-Site Manager, Inc. ("On-Site"), which provides tenant screening

reports to landlords, produced reports stating that Wenning and Correa had each been a

defendant in a "Forcible Entry/Detainer" case ending in a judgment for the landlord.

      Plaintiffs now bring this action under the Fair Credit Reporting Act, 15 U.S.C. § 1681

("FCRA"), the New York Fair Credit Reporting Act ("NYFCRA"), and Section 349 of the New

York General Business Law ("NYGBL"). They claim that On-Site did not maintain reasonable

procedures to assure the accuracy of the reports it provided to landlords. In particular, plaintiffs

claim that the term "Forcible Entry/Detainer" was inaccurate; that On-Site's failure to use a more

accurate term and to provide additional information clarifying the nature of plaintiffs' Housing

Court proceedings was unreasonable; and that On-Site's dissemination of inaccurate reports

caused plaintiffs emotional distress.

On-Site now moves for summary judgment, and plaintiffs move for partial summary judgment.  For the following reasons, On-Site's motion is granted and plaintiffs' is denied.

## I.    Background

### A.    Facts[1]

The Court begins by reviewing the evidence relating to Wenning and Correa, including the Housing Court proceedings that gave rise to the entries on their respective On-Site screening reports.  The Court then reviews the evidence relating to On-Site's procedures for reporting Housing Court proceedings.

#### 1.    Plaintiff Wenning

##### a.    2011 Housing Court Proceeding

Since at least 2005, and continuing into 2011, Wenning was the tenant in a rent-stabilized apartment at 208 East 82nd Street, Apt. 31, New York, NY 10028.  Joint 56.1, ¶ 1.  On or about November 15, 2010, Wenning's landlord, 82nd Street Associates LLC, notified her that it intended not to renew her lease, which was set to expire on February 28, 2011.  *Id.* ¶¶ 3–4.  The notice alleged, *inter alia*, that Wenning had not been using the apartment as her primary

---

[1] The following facts are drawn primarily from the parties' combined Local Rule 56.1 Statement of Undisputed Facts, Dkt. 85 ("Joint 56.1"), which includes (a) undisputed facts from the Joint Statement of Facts, Dkt. 68 ("JSF"); (b) other undisputed facts; and (c) certain disputed facts. Citations to a party's Rule 56.1 statement incorporate by reference the documents cited therein. Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[ ] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

residence and had illegally sublet and/or assigned the apartment to another person. *Id.* ¶ 5. Wenning retained counsel. *Id.* ¶ 8.

On February 28, 2011, Wenning, her landlord, and their attorneys executed a "Stipulation of Settlement." *See* Dkt. 74 ("Scher Decl."), Ex. I ("Wenning Stip." or "Stipulation"). On or about March 11, 2011, the landlord commenced a proceeding in the Housing Part of the Civil Court of the City of New York ("Housing Court"), and soon thereafter filed the Stipulation there. Joint 56.1, ¶¶ 9, 11. In the Stipulation, Wenning consented to "a final judgment of possession" in the landlord's favor. Wenning Stip. ¶ 3. The Stipulation also provided that Wenning would be named as the respondent in the Housing Court proceeding,[2] *id.* ¶ 1, and would vacate the apartment by August 31, 2011, *id.* ¶ 5. Wenning further consented to pre-service of a Marshal's notice at any time after August 10, 2011, so that possession could be recovered on September 1 if Wenning had not, by then, vacated the apartment. *Id.* The landlord, in turn, agreed to waive Wenning's rent from March through July and to apply a security deposit toward the August rent. *Id.* ¶ 11.

On March 14, 2011, based on the Stipulation, the Housing Court entered a judgment of possession in the landlord's favor. Joint 56.1, ¶ 19; *see* Scher Decl., Ex. J ("Wenning Judgment"). Wenning voluntarily vacated and surrendered possession of the apartment on or before August 31, 2011, and no warrant of eviction was executed to recover possession. Joint 56.1, ¶¶ 21, 168, 170.

---

[2] The proceeding as instituted named the respondent as "Jane Doe." Joint 56.1, ¶ 10. Wenning testified that her understanding at the time was that her name would not "show up in anything." Scher Decl., Ex. F ("Wenning Dep."), at 48; *see id.* 48–51 (testifying that her counsel in the Housing Court proceeding—not her counsel in this case—told her she would not be listed as a party or "blacklisted").

b.     *Wenning's Efforts to Rent an Apartment*

Wenning subsequently applied to rent a subsidized apartment at 510–550 West 45th Street, known as "Gotham West."  *Id.* ¶ 22.  Her application for the Gotham West lottery was handled by an organization called Common Ground Community Housing Development Fund Corporation, Inc. ("Common Ground").  *Id.* ¶ 23.  On or about May 12, 2014, Common Ground obtained a tenant screening report on Wenning from On-Site.  *Id.* ¶ 24; *see* Scher Decl., Ex. K ("Wenning Report").  The Wenning Report, which stated that it contained information "accurately copied from public records," included information relating to Wenning's 2011 Housing Court proceeding.[3]  Joint 56.1, ¶ 176.  It set out the case number, the court, and the filing date, and listed Wenning's landlord as the "plaintiff" and Wenning as the "defendant."  *See* Wenning Report.  Most relevant here, it described the "Case Type"[4] as "Forcible Entry/Detainer" (highlighted in yellow) and described the "Judgment" as "For Plaintiff."[5]  *See id.*; Joint 56.1, ¶ 175.  At the bottom of the Housing Court section, the Report stated that "[a] housing court record does not necessarily mean that a tenant owed rent or was evicted from an apartment."  *See* Wenning Report.

Common Ground and/or Gotham West had set their tenant-screening criteria to automatically "fail" any prospective tenant who had any housing court record collected by On-

---

[3] It also included other information, such as criminal history and credit history.  None of this other information reflected negatively on Wenning.  *See* Joint 56.1, ¶¶ 172–73; Wenning Report.

[4] On-Site's website provided customers with a glossary stating that "[t]he Case Type field shows the type of case this record contains, which will concern recovery of rent, compliance with the terms of the lease, or gaining possession of an apartment."  Scher Decl., Ex. JJ.

[5] For unknown reasons, perhaps a clerical error, the filing date is listed as April 2011 rather than March and the judgment date is May 14, 2011 rather than March 14, 2011.

Site. *See* Joint 56.1, ¶ 25.[6]  On this basis, Wenning's application failed, and on or about May 15,

2014, Denise St. Just-Cordero of Common Ground informed Wenning that her application for an

apartment through the Gotham West lottery had been rejected. *Id.* ¶ 28.  Just-Cordero told

Wenning, *inter alia,* that Common Ground generally sees the term "Forcible Entry/Detainer"

used "in situations where landlords institute a case against a tenant to have them removed from

the apartment/lease."  Scher Decl., Ex. M (email of May 15, 2014, 6:16 p.m.).  Common Ground

also gave Wenning a formal notice of rejection that listed, as the reason for rejection, "Housing

court record – April 2011 – 'Forcible Entry/Detainer.'"  *Id.*, Ex. N ("Wenning Rejection Letter").

However, Just-Cordero encouraged Wenning to appeal her rejection.  Joint 56.1, ¶ 35.

A few days later, Wenning retained the services of her present counsel to aid in that

appeal. *Id.* ¶ 36.  Counsel promptly contacted On-Site to obtain a copy of the Wenning Report.

*Id.* ¶¶ 37–38.  Counsel also contacted Wenning's former landlord's attorney, seeking the

landlord's consent to a stipulation vacating the Wenning Judgment, as well as a letter of

reference for Wenning.  *See id.* ¶¶ 39–40.  On or about May 21, 2014, the landlord's counsel

executed the stipulation and Wenning's counsel filed it with the Housing Court, copying On-

Site.  *See id.* ¶¶ 42–43.

On or about May 22, 2014—one week after Wenning first learned about the problem

with her On-Site report—On-Site generated an amended screening report that no longer

contained any reference to the Housing Court proceeding, and provided that report to Wenning's

---

[6] Plaintiffs object that there is "no proffered evidence as to the prospective landlord's intent regarding setting screening criteria."  Joint 56.1, ¶ 25.  But plaintiffs ignore Exhibit L to the Scher Declaration, which purports to be "a true copy of the screening criteria settings" for the Gotham West lottery.  Scher Decl. ¶ 14.  There is no claim that this exhibit is inadmissible or that it inaccurately reflects the screening criteria that were set.  And the landlord's subjective intent, which plaintiffs emphasize, is not relevant.  Therefore, under Local Rule 56.1(c)–(d), the Court takes as true the proposition proferred by On-Site at Joint 56.1, ¶ 25.

counsel. *Id.* ¶ 45.  Wenning then forwarded the amended report to Common Ground.  *Id.* ¶ 46. Finally, on May 28, 2014—13 days after Wenning's application was denied—Wenning was approved as a tenant at Gotham West.  *Id.* ¶ 47.

*c.*     *Wenning's Reaction to Learning of the On-Site Report*

In her deposition, Wenning repeatedly testified that, when she heard the term "Forcible Entry/Detainer" used to describe her 2011 Housing Court proceeding, she felt she was being called a criminal.  *See* Wenning Dep. 55–57, 59, 82, 129; *see also id.* at 145 ("Forcible Entry/Detainer, comes across like, oh my God, what did I do?  Somebody is just going to -- some marshall [sic] is going to stampede in my apartment and pull me out by the hair."); *see id.* at 56 (similar testimony).  She testified that she was "blindsided" because "[e]verything was perfect" with her application and she could "almost taste having a lease of [her] own."  *See id.* at 57, 82. The words "Forcible Entry/Detainer" rung in her ears.  *See id.* at 57, 139.  She was "highly embarrassed" and "humiliated."  *See id.* at 57, 83.  She "had a meltdown and cried hysterically" and "was in a complete upset panic."  *Id.* at 83, 117.  She "became totally unglued" and her "world came apart."  *Id.* at 81–82.  Her life "was turned into hell" and she suffered "horrible distress" as she "[came] up against a very intimidating process" that required her "to go through hell and high water to turn it around."  *Id.* at 130–32.

Wenning did not obtain medical treatment relating to this distress.  Joint 56.1, ¶ 48.  She testified that she "could have used some therapy," Wenning Dep. 143, but could not afford it. *See id.* 145–46.

**2.     Plaintiff Correa**

Correa's story is quite similar to Wenning's, at least in its essential facts.

6

### a.      2012 Housing Court Proceeding

In 2012, Correa had been the subtenant of a rent-stabilized apartment at 309 West 57th Street, Apt. 1208, New York, NY for about four years.  Joint 56.1, ¶ 49.  Alexander Scroczynski was the prime tenant of the apartment; he sublet the apartment to Correa, and Correa believed that Scroczynski had the landlord's consent to do so.  *Id.* ¶¶ 50, 181.  On or about January 3, 2012, Correa's landlord mailed a Notice to Cure to Scroczynski's attention at Apt. 1208, alleging that Scroczynski was subletting the apartment without consent.  *Id.* ¶¶ 52–53.  On or about January 27, 2012, the landlord mailed a Notice of Termination, stating that Scroczynski's tenancy would be terminated effective February 10, 2012 because he had failed to cure the defects cited in the Notice to Cure.  *Id.* ¶¶ 56–57.  On or about February 15, 2012, the landlord commenced a proceeding in Housing Court, identifying "Andres 'Doe'" as a "Respondent-Undertenant."  *Id.* ¶¶ 59–60.

On or about February 28, 2012, Correa and the landlord executed a Stipulation of Settlement.  *Id.* ¶ 63; *see* Scher Decl., Ex. S ("Correa Stip." or "Stipulation").  In the Stipulation, Correa acknowledged that he was being sued as "Andres 'Doe'" and consented to the entry of final judgment of possession in the landlord's favor.[7]  Correa Stip. ¶¶ 2, 4.  The landlord agreed to allow Correa to remain in possession of the apartment through October 31, 2012, provided he

---

[7] Correa's Stipulation, unlike Wenning's, did not contemplate amendment of the case caption to reflect Correa's full name.  *Compare* Wenning Stip. ¶ 2 ("The Petition is amended to include Deborah Wenning as a party Respondent and she is substituted in place of Jane Doe."), *with* Correa Stip. ¶ 2 ("Respondent Andres Correa . . . waives any and all objections or defenses . . . to a judgment being entered and enforced against him under the name 'Andres Doe', and acknowledges that petitioner has commenced this proceeding against him under the name 'Andres Doe' with his express consent and for his benefit.").  It thus appears that Correa took reasonable steps to ensure that a judgment would not be entered against him by name.  The record does not disclose why the Housing Court's judgment was ultimately entered against Correa by name, which initiated the chain of events leading to this action.

pay rent at the rent-stabilized rate.  *Id.* ¶ 4.  On or about March 30, 2012, the Housing Court entered a judgment of possession in the landlord's favor and against both Scroczynski and Correa.  Joint 56.1, ¶ 68; *see* Scher Decl., Ex. T ("Correa Judgment").  Correa vacated the apartment on or before October 31, 2012, and a warrant of eviction was never executed to recover possession of the apartment.  Joint 56.1, ¶¶ 79, 191.

### b.   *Correa's Efforts to Rent an Apartment*

Two subsequent housing applications by Correa are at issue in this suit.

### i.   *Chelsea Park Application*

In late 2012, Correa applied to rent an apartment in the building known as Chelsea Park, located at 260 West 26th Street, New York, NY.  *Id.* ¶ 81.  On or about April 4, 2013, the managing agent for the Chelsea Park landlord obtained a tenant-screening report on Correa from On-Site.  *Id.* ¶ 83.[8]  The Chelsea Park managing agent set its tenant-screening criteria to automatically "fail" prospective tenants with any housing court record.  *Id.* ¶ 84.[9]

On April 4, 2013, Correa met with the managing agent, who informed him that the On-Site report revealed that he had been involved in a Housing Court action.  *Id.* ¶ 85.  Correa contacted the attorney he had retained in connection with the Housing Court proceeding, who wrote a letter to the managing agent explaining the circumstances.  *See id.* ¶¶ 87–88.  Correa also emailed his former landlord's attorney requesting consent to a stipulation vacating the Judgment, which was denied.  *Id.* ¶ 89.  On October 16, 2013, the managing agent advised Correa that, to continue the application process, he needed to have the Housing Court record removed from his

---

[8] The report itself has not been produced.

[9] For the reasons stated in footnote 6, and also because the fact is admitted at JSF ¶ 72, the Court takes this fact as true.

report.  *Id.* ¶ 92.  Therefore, Correa again sought his former landlord's consent to vacate the

Judgment against him, and again was denied.  *Id.* ¶¶ 96–97.

Eventually, Correa received a Notice of Adverse Action from Chelsea Park, dated June

12, 2014.  *Id.* ¶ 98; Scher Decl., Ex. Z ("Chelsea Park Rejection").  It explained that Chelsea

Park could not offer Correa a lease because his On-Site report "include[d] a landlord tenant court

record or you owe money to a previous landlord."  Chelsea Park Rejection ¶ 3.

<em>ii.      The Prince George Application</em>

In or about May 2013, Correa applied to rent an apartment in the building known as the

Prince George, located at 14 East 28th Street, New York, NY.  Joint 56.1, ¶ 100.  The managing

agent for the Prince George's landlord was Common Ground.  *Id.* ¶ 101.  In or about June

2014—around the same time Correa received the Chelsea Park Rejection—Common Ground

informed him that his name had reached the top of the waiting list and that they would proceed

with a credit report.  *Id.* ¶ 102.  On or about June 11, 2014, Common Ground obtained a tenant-

screening report on Correa from On-Site.  *Id.* ¶ 103; *see* Scher Decl., Ex. AA ("Correa Report").

The Report stated that Correa was a "defendant" in a case brought by his landlord in February

2012.  *See* Correa Report.  It described the "Case Type" as "Forcible Entry/Detainer"; stated that

a judgment had been entered for the landlord on March 30, 2012; and, in relevant part, was

otherwise identical to the Wenning Report discussed above.  *See* Joint 56.1, ¶ 201.

Common Ground, on behalf of the Prince George, also set its tenant-screening criteria to

automatically "fail" prospective tenants with any housing court record.  *Id.* ¶ 104.[10]  On or about

June 12, 2014, Common Ground informed Correa that, because the Correa Report revealed the

existence of a Housing Court record, his application would be rejected.  *Id.* ¶ 107.  On or about

---

[10] For the reasons stated in footnote 6, this statement is taken as true.

June 13, 2014, Correa received a Notice of Adverse Action from the Prince George's landlord stating that his application was rejected because the Correa Report "include[d] a landlord tenant court record or you owe money to a previous landlord." *Id.* ¶¶ 111–12; *see* Scher Decl., Ex. DD ("Prince George Rejection").

Meanwhile, Correa obtained a copy of his On-Site report. *See id.* ¶¶ 109–10. Correa also retained his present counsel, who contacted his former landlord's attorney to, again, seek consent to vacate the Judgment against him. *See id.* ¶¶ 113–14. The landlord's attorney, this time, executed such a Stipulation. *Id.* ¶ 115; *see* Scher Decl., Ex. FF. On or about June 25, 2014, counsel filed the Stipulation and provided a copy to On-Site. *Id.* ¶ 116.

On-Site shortly thereafter generated, and provided to Correa's counsel, an amended report that omitted all references to the 2012 Housing Court proceeding. *Id.* ¶ 118.

> c.     *Correa's Reaction to Learning of the On-Site Report*

At his deposition, Correa testified that, when he heard he had been "blacklisted," *i.e.*, that he was denied an apartment because of his Housing Court record, it was "shocking" because he had "never done anything wrong." Scher Decl., Ex. G ("Correa Dep."), at 81. Indeed, Correa testified that when he was told that a Housing Court record had turned up, he "almost fainted." *Id.* at 85. Correa was concerned about his professional reputation as a journalist because of the implication that he had lied. *See id.* at 82; *see also id.* at 51–52 ("[C]redibility is everything for me. I made a living about telling the truth and helping people to tell the truth . . . and I didn't want to end up with my name on the wrong list."). Correa also testified that he "got depressed" and for a time stopped applying for apartments because he thought he would have to go through the same "humiliating" and accusatory process. *Id.* at 83–84. As for Correa's reaction to the term "Forcible Entry/Detainer," he testified:  "I still don't understand what that means. It must

be terrible because forcible means to force something. . . . [I]t was terrible.  Because forcible means that I did something against the law, that I forced something.  That is what scared me when I read that.  And that was totally inaccurate because I didn't do anything wrong."  *Id.* at 91, 129.  Correa also testified that the years since these events have been "a nightmare"—he has moved frequently, lost weight, started losing his hair, and almost lost his voice "because [of] the stress."  *Id.* at 132.

### 3.    On-Site's Procedures for Producing Tenant-Screening Reports

On-Site, a California-based company, provides tenant-screening services to landlords, managing agents, and rental agents across the United States.  *See* Joint 56.1, ¶¶ 120–21.  On-Site's reports cover a variety of areas, including public housing court records.  *See id.* ¶ 122.  On-Site's New York City business includes preparing tenant reports containing information about New York City Housing Court records, which are used in connection with rental applications by prospective tenants.  *Id.* ¶ 210–11.

Since 2009, On-Site has obtained data relating to New York City Housing Court proceedings from LexisNexis Risk Data Retrieval Services LLC and its successors ("Lexis").  *Id.* ¶ 123.  Before that, On-Site purchased Housing Court data directly from the New York State Office of Court Administration ("OCA").  *Id.* ¶ 124.  Lexis is an established and experienced vendor, and On-Site believed it a reputable source of accurate information concerning Housing Court proceedings.  *Id.* ¶¶ 125–26.  Lexis obtains information directly from the paper files in the Housing Court clerk's office, which it translates into a daily stream of data made available to companies like On-Site.  *Id.* ¶¶ 129–30.  On-Site monitors complaints regarding the accuracy of the data obtained from Lexis.  *Id.* ¶ 128.

Important here, Lexis uses the term "Forcible Entry/Detainer" to refer to proceedings in the New York City Housing Court—and housing courts across the country—that have resulted in

11

the entry of a nonmonetary judgment of possession.  *Id.* ¶ 134; *see* Scher Decl, Ex. H ("Johnson

Dep."), at 94.  However, there is evidence, including testimony from two On-Site executives,

that that term is not used in the New York City Housing Court.  *See id.*, Ex. D ("Basart Dep."), at

35–36; *id.*, Ex. E ("Jones Dep."), at 124.  Indeed, before 2009, when On-Site used the OCA's

data, it used the term "holdover" to refer to such proceedings.  Joint 56.1, ¶¶ 217–18.  Since

2012, On-Site has used the term "Forcible Entry/Detainer" in 19 reports to refer to a New York

City Housing Court proceeding.  *Id.* ¶ 144.  Before this action was filed, On-Site had not

received any complaints (formal or informal) regarding the accuracy of that term.  *Id.* ¶ 145.

After this action was filed, On-Site changed its terminology; in lieu of "Forcible Entry/Detainer,"

it now uses the term "Civil Action for Possession."  *Id.* ¶ 146.

On-Site's clients use a website to access its tenant-screening reports.  They can use

factors like income, credit history, bankruptcies, residency history, and criminal history to assist

in screening these reports.  *Id.* ¶ 148.  Within the residency history category, On-Site's clients

can choose to look at whether there are any "landlord tenant court records or unpaid landlord

collections" going back as far as seven years.  *Id.* ¶¶ 154–55.  Clients are given the option to

"ignore dismissed or satisfied records" or to "ignore filings only."  *Id.* ¶ 156.  They can also

choose how many landlord-tenant court records they are unwilling to tolerate, ranging from "any

number" to "more than 5."  *Id.* ¶ 157.  Finally, clients can rate the importance of housing court

records on a scale from "not considered" to "pass/fail."  *Id.* ¶ 158.  Setting it to "pass/fail"

results—and clients are advised that it will result—in an automatic recommendation of rejection.

*Id.* ¶ 159.  After clients set their criteria and parameters, On-Site produces a "scorecard" that

summarizes the results.  *Id.* ¶ 150.

B.      **Procedural History**

On December 9, 2014, plaintiffs filed the initial Complaint in this case.  Dkt. 1.  On February 3, 2015, plaintiffs filed an Amended Complaint.  Dkt. 3.  On February 23, 2015, On-Site answered.  Dkt. 6.  On August 21, 2015, plaintiffs filed a Second Amended Complaint, removing, pursuant to a stipulation between the parties, a paragraph in the Amended Complaint seeking legal fees.  Dkt. 37 ("SAC").  On September 29, 2015, On-Site answered.  Dkt. 42.

On January 12, 2016, On-Site moved for summary judgment.  Dkt. 69.  On-Site filed a brief in support, Dkt. 71 ("On-Site Br."); a Local Rule 56.1 Statement of Undisputed Facts, Dkt. 73 ("On-Site 56.1"); and the declaration of Brett A. Scher and attached exhibits, Dkt. 74 ("Scher Decl.").

On January 29, 2016, plaintiffs moved for partial summary judgment on their "'Forcible Entry/Detainer' claim."  Dkt. 78.  As their accompanying brief clarified, plaintiffs sought judgment as a matter of law that the use of the term "Forcible Entry/Detainer" in plaintiffs' On-Site reports violated the FCRA and NYFCRA.  *See* Dkt. 79 ("Pl. Br.") at 11–18.  Plaintiffs also opposed granting summary judgment for On-Site on the SAC's other allegations of inaccuracies in the reports.  Plaintiffs submitted a Local Rule 56.1 Statement of Undisputed Facts, Dkt. 80 ("Pl. 56.1"), and the declarations of James B. Fishman, Dkt. 81 ("Fishman Decl."); Deborah Wenning, Dkt. 82 ("Wenning Decl."); Andres Correa, Dkt. 83 ("Correa Decl."); and Alia Razzaq, Dkt. 84 ("Razzaq Decl.").

On February 12, 2016, On-Site filed a reply/opposition brief, Dkt. 88 ("On-Site Reply Br."); the Joint 56.1; a supplemental declaration of Brett A. Scher, Dkt. 86 ("Scher Supp. Decl."); and a declaration of Eric Basart, Dkt. 87 ("Basart Decl.").  On February 29, 2016, plaintiffs filed a reply brief, Dkt. 90 ("Pl. Reply Br.").  On March 31, 2016, the Court heard argument.  Dkt. 98 ("Tr.").

## II.       Applicable Legal Standards

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a question of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

When the movant has properly supported its motion with evidentiary materials, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  An issue of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted).  "Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

"A court faced with cross-motions for summary judgment need not 'grant judgment as a matter of law for one side or the other,' but 'must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Cariou v. Prince*, 784 F. Supp. 2d 337, 345 (S.D.N.Y. 2011) (quoting *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)).

14

## III.    Discussion

The Court begins by outlining the legal framework of the Fair Credit Reporting Act, focusing on the provision at issue here, 15 U.S.C. § 1681e(b), which mandates the use of reasonable procedures to assure accuracy in credit reports.[11]  The Court then reviews the elements of § 1681e(b) claims, both those sounding in negligence and those sounding in willfulness.  Finally, the Court turns to the claim under NYGBL § 349.

### A.    FCRA Legal Framework

"Congress enacted FCRA in 1970 to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy."  *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007).  "The FCRA creates a private right of action against credit reporting agencies for the negligent or willful violation of any duty imposed under the statute."  *Casella v. Equifax Credit Info. Servs.*, 56 F.3d 469, 473 (2d Cir. 1995) (citing 15 U.S.C. §§ 1681o & 1681n) (citations omitted).  The duty at issue in this case is imposed by 15 U.S.C. § 1681e(b), which provides:  "Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

To prevail on a *negligence* claim under this provision, a plaintiff must establish that: (1) the consumer reporting agency ("CRA") reported inaccurate information about the plaintiff; (2) the CRA was negligent in that it failed to follow reasonable procedures to assure the accuracy of its credit report; (3) the plaintiff was injured; and (4) the CRA's negligence caused the plaintiff's injury.  *Gorman v. Experian Info. Sols., Inc.*, No. 07 Civ. 1846 (RPP), 2008 WL 4934047, at *4

---

[11] The Court does not separately address the NYFCRA.  Its substantially similar language is construed the same as the FCRA's.  *See Ogbon v. Beneficial Credit Servs., Inc.*, No. 10 Civ. 3760 (PAE), 2013 WL 1430467, at *7 n.6 (S.D.N.Y. Apr. 8, 2013) (citing *Scott v. Real Estate Fin. Grp.*, 183 F.3d 97, 100 (2d Cir. 1999)).

(S.D.N.Y. Nov. 19, 2008) (citing *Whelan v. Trans Union Credit Reporting Agency*, 862 F. Supp. 824, 829 (E.D.N.Y. 1994)).  Thus, succinctly stated, the elements of a negligence claim are (1) inaccuracy, (2) failure to follow reasonable procedures, (3) actual damages, and (4) causation.[12] A plaintiff who prevails on a negligence claim is entitled to actual damages and costs.  *See* 15 U.S.C. § 1681o.

By contrast, a plaintiff who prevails on a willfulness claim is entitled to (1) either actual damages *or* statutory damages between $100 and $1,000; (2) punitive damages; and (3) costs. *See id.* § 1681n; *Northrop v. Hoffman of Simsbury, Inc.*, 12 F. App'x 44, 50 (2d Cir. 2001) (summary order) ("Actual damages are not a statutory prerequisite to punitive damages.").  Thus, the elements of a willfulness claim are (1) inaccuracy and (2) a failure to follow reasonable procedures that is (3) knowing or reckless.  *See Safeco*, 551 U.S. at 57–58 ("willfulness" in FCRA encompasses both knowing and reckless violations).

**B.  Negligence Claim**

As noted, the elements of a negligence claim under § 1681e(b) are (1) inaccurate information, (2) failure to follow reasonable procedures to assure accuracy, (3) actual damages, and (4) causation.  The Court examines these elements in turn.

Ultimately, the Court holds that, while plaintiffs have submitted sufficient evidence to reach a jury as to the elements of inaccuracy and unreasonableness in On-Site's use of the term "Forcible Entry/Detainer" to describe plaintiffs' Housing Court proceedings, their negligence claims founder on the elements of damages and causation.

---

[12] There is no dispute about other precursors to such a claim.  For instance, it is undisputed that On-Site is a "consumer reporting agency" and that it produced a "consumer report" as those terms are defined under the FCRA.

1.        **Inaccurate Information**

a.        *Legal Standards*

The overwhelming weight of authority holds that a credit report is inaccurate under

§ 1681e(b) either "when it is patently incorrect *or* when it is misleading in such a way and to

such an extent that it can be expected to have an adverse effect." *Dalton v. Capital Associated*

*Indus., Inc.*, 257 F.3d 409, 415 (4th Cir. 2001) (quoting *Sepulvado v. CSC Credit Servs.*, 158

F.3d 890, 895 (5th Cir. 1998)) (alterations and internal quotation marks omitted) (emphasis

added); *see also Schweitzer v. Equifax Info. Sols. LLC*, 441 F. App'x 896, 902 (3d Cir. 2011);

*Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 890–91 (9th Cir. 2010); *Koropoulos v.*

*Credit Bureau, Inc.*, 734 F.2d 37, 40 (D.C. Cir. 1984).   Although the Second Circuit has not yet

addressed the issue, district courts in this Circuit have adopted this "materially misleading" test.

*See, e.g.*, *Fitzgerald v. Chase Home Fin., LLC*, No. 10 Civ. 4148 (CS), 2011 WL 9195046, at

*10 (S.D.N.Y. Feb. 28, 2011).[13]   Only one Circuit has clearly adopted the competing "technical

accuracy" test.   *See Dickens v. Trans Union Corp.*, 18 F. App'x 315, 318 (6th Cir. 2001).[14]   On

the strength of this authority, this Court adopts the "materially misleading" standard.

Under that test, mere imprecision—such as reporting that a plaintiff had "5 or more" late

payments on an account rather than six—does not render information actionable.   *Wagner v.*

---

[13] Three other Circuits have noted the issue but left it unresolved.  *See Taylor v. Tenant Tracker, Inc.*, 710 F.3d 824, 827 n.2 (8th Cir. 2013); *Ray v. Equifax Info. Servs., LLC*, 327 F. App'x 819, 826 n.3 (11th Cir. 2009); *Henson v. CSC Credit Servs.*, 29 F.3d 280, 285 n.4 (7th Cir. 1994).

[14] Under this test, a CRA "satisfies its duty" under § 1681e(b) if its report "contains factually correct information about a consumer that might nonetheless be misleading or incomplete in some respect."  *Dickens*, 18 F. App'x at 318 (quoting *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1157 (11th Cir. 1991)).  The Eleventh Circuit's decision in *Cahlin* is sometimes cited as adopting the technical accuracy test, but did no such thing; it merely explained the differing approaches.  *See* 936 F.2d at 1157.  In 2009, the Eleventh Circuit stated that it has "not yet adopted either model."  *Ray*, 327 F. App'x at 826 n.3.

*TRW, Inc.*, 139 F.3d 898, 1998 WL 127812, at *1 (5th Cir. 1998) (per curiam).  Rather, a

plaintiff must establish that the information provided by the CRA is "open to an interpretation

that is directly contradictory to the true information."  *Id.*

b.      <i>Application</i>

Plaintiffs identify a host of alleged inaccuracies in their On-Site reports.  They primarily

focus on (1) the use of the term "Forcible Entry/Detainer" to describe the Housing Court

proceedings in which plaintiffs were parties.  *See* Pl. Br. 13–15.  But they also challenge (2) the

omission of "mitigating information," *e.g.*, that the plaintiffs had agreed before the initiation of

Housing Court proceedings that they would voluntarily vacate their apartments, *see id.* at 19–20;

(3) the references to the parties in those proceedings as "plaintiffs" and "defendants," rather than

"petitioners" and "respondents," *see id.* at 18; and (4) "incorrect terms and misleading credit

score[s]" in the Notices of Adverse Action that informed plaintiffs that their applications had

been denied, *id.* at 21.  The Court addresses these four asserted inaccuracies in turn.

i.      <i>"Forcible Entry/Detainer"</i>

On-Site argues that the term "Forcible Entry/Detainer" is a term of art and, as such, is not

materially misleading.  *See* On-Site Br. 4–5.  According to On-Site, the term has common-law

roots and is still used in various jurisdictions in the United States to describe "a summary

proceeding to recover possession of premises forcibly or unlawfully detained."  *Id.* at 4 (quoting

http://thelawdictionary.org/forcible-entry-and-detainer).  And, On-Site argues, its landlord clients

are familiar with this "prevailing industry verbiage" and would not assume a tenant involved in

such a proceeding acted violently or forcefully, or that force was necessary to recover the

apartment from the tenant.  *Id.* at 6.  Plaintiffs, in response, argue that the term, on its face, is

inaccurate as applied to them.  And, they emphasize, the term is not actually used in New York

18

City Housing Court; rather it is a gloss that LexisNexis attached to certain cases, and which On-Site then reproduced.  *See* Pl. Br. 13–14.

For the reasons that follow, in the Court's view, a reasonable jury could resolve the "materially misleading" element for either party.  On On-Site's summary judgment motion, the record must be construed in the light most favorable to plaintiffs.  Plaintiffs have adduced sufficient evidence to prevent summary judgment from being granted on this point for On-Site, because a reasonable jury could find that the term "Forcible Entry/Detainer" was misleading to an extent that it could be expected to have an adverse effect on the tenant whom On-Site thus described.

First, it is essentially undisputed that the term "Forcible Entry/Detainer" is not in the New York City Housing Court's lexicon.  *See* Fishman Decl., Ex. B ("Scherer Report"), at 13;[15] Jones Dep. 124 (On-Site's chief technology officer testifying, "I don't believe that's a term that's used in New York.").  On-Site's own witness, Eric Basart, testified that the typical terms used in Housing Court to describe eviction proceedings are "nonpayment" and "holdover."  Basart Dep. 35–36.[16]  Basart also conceded—in a clear understatement—that the term "Forcible Entry/Detainer" "likely" did not appear in the relevant public records in *this* case.  *Id*. at 35.

---

[15] On-Site misses the mark with its passing contention that Scherer "has no relevant expertise for the purposes of this case" because he "does not proffer that he is knowledgeable in the Fair Credit Reporting Act, credit reporting, or the tenant screening business."  On-Site Reply Br. 3 n.2.  Plaintiffs proffer Scherer as an expert in "New York landlord-tenant and housing law."  Scherer Report 3.  That field of expertise is relevant to this case.  A finder of fact could fairly rely on Scherer's report for its analysis of that field.

[16] "Nonpayment" describes cases brought because a tenant has allegedly failed to pay rent.  "Holdover" describes cases where a landlord seeks to remove the tenant for another reason, including the expiration of the tenancy.  *See* Scherer Report 13.

Notably, where the term "Forcible Entry/Detainer" *is* used in New York law, it is used in an entirely different context—to describe a wrong committed by a landlord against a tenant. Section 853 of the New York Real Property Actions and Proceedings Law ("RPAPL") provides a damages cause of action for "forcible or unlawful entry or detainer" if an occupant is "put out of real property in a forcible or unlawful manner."  N.Y. Real Prop. Acts. Law § 853; *see also Walls v. Giuliani*, 916 F. Supp. 214, 218 (E.D.N.Y. 1996) (recognizing that "Forcible Entry and Detainer" statutes "provide a remedy for occupants who are forcibly removed from real property"); *Rostant v. Swersky*, 912 N.Y.S.2d 200, 202 (1st Dep't 2010) (§ 853 provides treble damages for "wrongful eviction").  The New York State Supreme Court, and not the New York City Housing Court, has jurisdiction over such lawsuits.  *See* Scherer Report 13; *Rostant*, 912 N.Y.S.2d at 201.

On-Site nevertheless argues that "Forcible Entry/Detainer" is essentially synonymous with what New York City courts call "holdover" proceedings, ones where the landlord seeks to remove the tenant for a reason other than non-payment of rent.  *See* Basart Dep. 36 (comparing the use of these different terms to saying "12 eggs" as opposed to "a dozen eggs"); On-Site Br. 4–5.  On-Site notes that many other states use the term "Forcible Entry/Detainer" to describe such proceedings.  *See* Scher Decl., Ex. C ("Kuehn Report"), at 8 (citing Arizona, Illinois, Iowa, Maine, Nebraska, New Mexico, Ohio, Oklahoma, South Dakota, and Wyoming statutes).  But plaintiffs have produced evidence that, whatever the practice is in those distant states, in New York City, "Forcible Entry/Detainer" is not at all synonymous with a holdover proceeding, but connotes something very different.

In this case, the Court holds, a reasonable jury could find the local understanding of that term (*i.e.*, its meaning in New York City) to be the relevant metric for determining whether its

use was accurate as opposed to materially misleading.  Plaintiffs' Housing Court proceedings

occurred in New York City, and the audience for plaintiffs' On-Site reports was, after all, New

York City landlords.  And, as plaintiffs note, such an audience—lacking any experiential basis

for treating the term "Forcible Entry/Detainer" as synonymous with a holdover proceeding—

could easily misconstrue it to connote that the landlord had been compelled to expel the tenant

by force.  As such, a reasonable jury could find that this evocative term inaccurately described

the consensual proceedings to which Wenning and Correa were party, in which the Housing

Court did no more than so-order stipulations between a tenant and a landlord.  The jury could

also find that the term "Forcible Entry/Detainer" could be expected to cause reasonable New

York City landlords to view prospective tenants negatively or to exclude them from

consideration altogether.  That is particularly so because the term does describe other New York

City court proceedings, ones involving the use of force (by a landlord).

       This holding does not oblige every CRA to replicate scrupulously the precise terms used

in every housing court across the country.  Jurisdictions assuredly use a variety of trivially

distinct terms to describe the same underlying concepts, and a CRA is at liberty to use umbrella

term to capture similar actions.  Mere imprecision that is not materially misleading does not

amount to an "inaccuracy" under the FCRA.  Here, however, a reasonable jury could find a

materially misleading statement.  It could find that the term applied by On-Site falsely conveyed

a degree of tenant intransigence—necessitating a forcible removal—that for the tenant could

serve as a scarlet letter in the eyes of future landlords.

       On-Site counters that landlords are "sophisticated parties" who would understand that a

"Forcible Entry/Detainer" notation connotes a run-of-the-mill, peaceable holdover proceeding.

*See* On-Site Br. 8–9.  That argument, however, is properly directed to a jury, not to a court for a

conclusive judgment as a matter of law.  The summary judgment record certainly does not compel such a finding.  On the contrary, On-Site's suggestion that New York City landlords widely understand this term is an *ipse dixit,* lacking empirical support.  And it is all the more implausible because, to the extent that term is used at all in New York courts, it describes an action far afield from (and far more contentious than) a holdover proceeding resolved consensually by stipulation: an action by an occupant seeking damages for a landlord's wrongful, and perhaps forcible, eviction.

Further, the two cases that On-Site cites on this point are inapposite.  In the first, *Dickens v. Trans Union Corp.*, the Sixth Circuit, applying the defendant-friendly "technical accuracy" standard which this Court has rejected, upheld a grant of summary judgment for Trans Union. Dickens had argued that his credit report was "misleading" because it described a car loan that Dickens had co-signed for his daughter as "Included in Bankruptcy" without specifying that it was not Dickens, but his daughter, who filed for bankruptcy, and because it listed the loan as "Charged Off as Bad Debt" without indicating that the loan later was paid in full.  18 F. App'x at 318.  Dickens did not dispute that the report was technically accurate.  He urged the Court instead to adopt the "materially misleading" test.  *See id.*  The Sixth Circuit rejected that invitation, while noting in *dicta* that the report was not misleading because it also accurately described Dickens as a "participant" on the relevant account, and there was "no question" that the bank that later denied Dickens's credit card application accurately "understood Dickens's role in the bankruptcy proceeding."  *Id.*

In the second case cited by On-Site, *Toliver v. Experian Information Solutions, Inc.*, a district court granted summary judgment for Experian on the ground that an entry in Toliver's credit report regarding a credit card account on which Toliver had defaulted six years earlier and

later charged off was not materially misleading.  973 F. Supp. 2d 707, 710–11 (S.D. Tex. 2013).

Relevant here, Toliver argued that a code stating that her account was "open" was inaccurate.  *Id.*

at 718.  She claimed that the term "open" could be misconstrued to suggest the account had not

been charged off, but rather was "a fresh and new delinquency from the original lender."  *Id.*

(quoting the complaint).  However, "open" was a term of art with a defined meaning for the

target audience:  It was defined in the Credit Reporting Resource Guide ("CRRG") to refer to

"accounts where the entire balance is due upon demand or that have one payment due as

scheduled."  *Id.*  The CRRG also noted that the term "open" was used not just by original

lenders, but by various non-original creditors, including debt buyers like the one that had

reported Toliver's debt to Experian.  *See id.* at 719.  And another code on the report accurately

reflected that Toliver's account had been assigned to collections.  *See id.*  Because these codes

were "well-defined and the definitions known and accessible to those in the credit reporting

industry," the district court held that the codes were not misleading.  *Id.*

These precedents are readily distinguished, so as not to avail On-Site here.[17]  Unlike in

*Dickens* and *Toliver*, plaintiffs have persuasively explained why a reasonable jury could find the

term "Forcible Entry/Detainer" materially misleading to the relevant audience.  The connotations

of struggle or resistance inherent in the term "Forcible Entry/Detainer," in particular in the

---

[17] On-Site argues that the "critical inquiry" is whether prospective New York landlords would understand the term "Forcible Entry/Detainer" to refer to Housing Court proceedings like plaintiffs'.  *See* On-Site Reply Br. 3.  The Court assumes *arguendo* that landlords are indeed the relevant audience.  That said, where, as here, plaintiffs seek emotional damages caused by *their* misunderstanding of the term "Forcible Entry/Detainer," the relevant audience in assessing whether On-Site's terminology was materially misleading may, arguably, also include other expected readers of the reports, including the prospective tenant himself or herself.  The Court has no occasion to resolve here the issue of the proper definition of the audience because, even adopting On-Site's definition, the record does not support summary judgment for On-Site on this element.

embedded term "forcible," make it a question of fact whether the term would likely mislead a potential landlord, to the detriment of the prospective tenant so described. A reasonable jury could find that a New York City landlord weighing a prospective tenant who had been party to a housing case involving "forcible entry" would conclude that some physical intervention had been necessary to wrest possession from the tenant, and therefore would be wary to rent to such a person.[18] Such a landlord, a jury could find, might not appreciate that On-Site intended such terminology to connote a peaceable holdover proceeding. Put differently, the label that On-Site applied to Wenning's and Correa's housing court cases is sufficiently "open to an interpretation that is directly contradictory to the true information" regarding these tenants to support a jury finding that it is inaccurate. *Wagner*, 1998 WL 127812, at *1.[19]

Toliver* is particularly inapposite, because there is evidence that "Forcible Entry/Detainer" is *not* a term of art with an established usage either in the forum (New York City Housing Court) or industry (New York real estate) at issue. *Toliver* found no inaccuracy given the definitive guidance supplied by the Credit Reporting Resource Guide. Here, in contrast, the summary judgment record here does not reflect an authoritative industry guidebook or glossary accessible to New York City landlords in which the term "Forcible Entry/Detainer" is defined in a manner consistent with On-Site's usage. And a landlord's theoretical ability to run "a quick

---

[18] Notably, plaintiffs were not required to prove that any recipient was *actually* misled by this term. *See Dalton*, 257 F.3d at 415 (information must be "misleading in such a way and to such an extent that it *can be expected* to have an adverse effect") (quoting *Sepulvado*, 158 F.3d at 895) (alterations and internal quotation marks omitted) (emphasis added). Evidence that the inaccuracy did not actually mislead the relevant actors in a specific case would instead bear on the separate element of causation.

[19] As neither party has adduced survey evidence showing how a New York City audience (whether limited to landlords or defined more broadly) would understand On-Site's terminology, it is particularly appropriate to rely on such a common-sense, plain-reading interpretation of the disputed term.

search using either Google or Bing" that might "allay any confusion" does not, as On-Site's

expert urges, eliminate the risk of confusion.  Kuehn Report 8 n.12.  The glossary that On-Site

made available to its customers clarified only that On-Site's housing court records pertained to

civil suits between tenants and landlords concerning "recovery of rent, compliance with the

terms of the lease, or gaining possession of an apartment."  Scher Decl., Ex. JJ.  That definition

does not rule out the possibility that a tenant who had been party to a "Forcible Entry/Detainer"

proceeding had resisted and had been ousted by means of force, resulting in either Housing Court

proceedings brought by the landlord or, conceivably, a tenant's civil suit claiming wrongful

eviction under RPAPL § 853.[20]

For these reasons, plaintiffs have produced sufficient evidence to reach the jury on the

question of whether the term "Forcible Entry/Detainer" is inaccurate within the meaning of the

FCRA.  At the same time, because a reasonable jury could also conclude, on this record, that a

New York City landlord would *not* be materially misled by the term, plaintiffs' cross-motion for

summary judgment must be denied.

### ii.     *Omission of Mitigating Information*

Plaintiffs also argue that their On-Site reports were inaccurate because they omitted

crucial mitigating information—to wit, that plaintiffs consented to the entry of judgment against

---

[20] Strictly speaking, a legally fluent landlord would be more likely to infer that "Forcible Entry/Detainer" refers to a Housing Court proceeding, not a § 853 proceeding, for several reasons.  First, in a § 853 action, Wenning and Correa (whom On-Site listed as defendants in the "Forcible Entry/Detainer" cases) would presumably have been described as plaintiffs, and their landlords as defendants.  Second, because New York City Housing Court does not have jurisdiction over § 853 actions, On-Site's reports might not pick up such actions.  *See* Scher Decl., Ex. JJ.  Therefore, a sophisticated landlord would likely infer that the actions indicated in Wenning's and Correa's reports had been brought in Housing Court.  The FCRA does not, however, cover only those inaccuracies capable of duping sophisticated audiences.  In any event, whatever the forum or the style of the legal action, the implication of the term "Forcible Entry/Detainer" is that the tenant resisted vacating, requiring the landlord to resort to force.

them, that they did so before Housing Court proceedings were initiated, that the judgments were for possession only and not for money, and that plaintiffs fully honored their duty to vacate. *See* Pl. Br. 19–20; SAC at ¶ 97(e)-(h). On-Site, pursuing summary judgment on this point, counters that § 1681e(b) does not impose any obligation to report such mitigating information. On-Site Br. 11.

In making this categorical argument, On-Site appears to urge adoption of the "technical accuracy" test, because, under the "materially misleading" test adopted by most courts (and this Court), the omission of crucial context could render a report actionable. Indeed, this scenario, as courts have noted, compellingly favors the materially-misleading test. Otherwise, "a consumer reporting agency could report that a person was 'involved' in a credit card scam, and without regard to [§ 1681e(b)] fail to report that he was in fact one of the victims of the scam." *Alexander v. Moore & Assocs., Inc.*, 553 F. Supp. 948, 952 (D. Haw. 1982); *see also Pinner v. Schmidt*, 805 F.2d 1258, 1262 (5th Cir. 1986) ("[A]ny person could easily have construed the notation 'Litigation Pending' as an indication that the plaintiff was being sued . . . while the actual situation was the reverse."). The Court therefore rejects On-Site's argument that liability under the FCRA cannot be based on an omission that leaves a materially misleading impression. Of course, a CRA's report need not be all-inclusive: As the Fifth Circuit has explained, completeness is not required "separate and apart from whether a particular entry or report is misleading." *Sepulvado*, 158 F.3d at 896.

On-Site separately argues that it is not obliged to obtain mitigating information where doing so would be unduly burdensome. *See* On-Site Br. 11–12. There is force to that argument, but it is germane not to the element of inaccuracy, but rather to the separate element of reasonableness. *See Sepulvado*, 158 F.3d at 896 (statute does not reflexively require a CRA to

investigate and report underlying details; rather, reasonableness implies drawing a context-specific balance); *Koropoulos*, 734 F.2d at 45 ("[W]e do not suggest that the [FCRA] requires all relevant credit information be included in agencies' reports: [It] only requires that agencies adopt reasonable procedures to ensure complete and precise reporting."); *Henson*, 29 F.3d at 285 (finding report inaccurate but holding, under reasonableness prong, that agencies are not required "to go beyond the face of numerous court records to determine whether they correctly report the outcome of the underlying action") (cited at On-Site Br. 11); *Wright v. Experian Info. Sols., Inc.*, 805 F.3d 1232, 1239 (10th Cir. 2015) (under reasonableness prong, CRAs "must look beyond information furnished to them when it is inconsistent with the[ir] own records, contains a facial inaccuracy, or comes from an unreliable source").

In arguing that accuracy is to be evaluated without regard to whether mitigating information was omitted, On-Site relies principally on *Childress v. Experian Information Solutions, Inc.*, 790 F.3d 745 (7th Cir. 2015) (Posner, J.). *See* On-Site Br. 11–12. There, the Seventh Circuit affirmed a grant of summary judgment for Experian where the plaintiff had complained that her credit report inaccurately described her bankruptcy petition as "dismissed," rather than "withdrawn." *See id.* at 746. The Circuit, focusing on the reasonableness element, rejected the plaintiff's claim that Experian "should monitor all dismissals of bankruptcy petitions and investigate to determine whether they were dismissed at the request of the petitioner." *Id.* at 747. That, the Circuit noted, "would require a live human being, with at least a little legal training, to review every bankruptcy dismissal and classify it as either voluntary or involuntary." *Id.* This would not be reasonable given, *inter alia*, the "variance in bankruptcy docket entries." *Id.* Only in its last paragraph did the Circuit touch on the separate element of inaccuracy: It observed that plaintiff's bankruptcy petition was not inaccurate because "[e]very bankruptcy

case that is 'withdrawn' at the request of the petitioner is dismissed." *Id.* As the above summary underscores, the *Childress* decision sheds light on the element of reasonable procedures, but it does not, as On-Site would have it, construe the element of inaccuracy.

A post-*Childress* district court decision demonstrates the continued viability of certain omission-based claims: "[A] report may be found to be inaccurate for § 1681e(b) purposes if it fails to include clarifying information about an entry that is ambiguous, [but] failure to explain the significance of an accurate report entry . . . is not sufficient to make a report inaccurate." *Taylor v. Screening Reports, Inc.*, No. 13 Civ. 2886, 2015 WL 4052824, at *5 (N.D. Ill. July 2, 2015) (cited at On-Site Br. 11; On-Site Reply Br. 5–6). The ultimate inquiry, as ever, is whether the omission of mitigating information renders the report materially misleading. *See also Stewart v. Credit Bureau, Inc.*, 734 F.2d 47, 55 (D.C. Cir. 1984) ("For a plaintiff to prevail on a section 1681e(b) claim based on allegations that a report is incomplete, the lack of completeness must be of a fundamental nature.").

Applying these principles, the decisive question here is whether a landlord's assessment of a prospective tenant's qualifications would be materially altered if the landlord knew not only that there had been a possessory judgment against the tenant in Housing Court (as On-Site's reports on Wenning and Correa conveyed), but also that the judgment had been entered on consent pursuant to a stipulation signed before the proceedings commenced, and that the tenant had fully complied with the terms of that stipulation. In the Court's view, this issue, too, is properly left for the jury. A reasonable jury could find that a landlord inclined to treat the tenant's Housing Court matter as disqualifying might change this view were these mitigating facts also disclosed. This scenario differs from the one presented to the Seventh Circuit in *Childress*. There, as Judge Posner observed, "the fact that [a bankruptcy] petition is dismissed at

the petitioner's request [is not] a reliable sign that she decided not to stiff her creditors by seeking a discharge—she may have dismissed the petition because she thought she'd be denied a discharge." 790 F.3d at 747–48. Here, by contrast, the fact that the prospective tenants fully cooperated and complied with their landlords (eschewing adversarial litigation) and obtained favorable settlements allowing them to remain in their apartments for extended periods of time may be viewed as substantially mitigating the perceived risks associated with their tenancy.

Moreover, plaintiffs here adduced evidence that eviction proceedings can be brought in New York City Housing Court for completely innocent reasons, independent of any breach by the tenant, let alone a failure by the tenant to relinquish occupancy. Plaintiffs' expert describes some such circumstances:

> (1) A summary proceeding may be commenced where a tenant has withheld rent in order to seek full compliance with the warranty of habitability, because there is no other procedure to obtain a rent abatement, *see* Scherer Report 12;

> (2) An innocent sublessee may be named as a respondent where the real dispute is between the landlord and the prime tenant who engaged in illegal subletting (as in Correa's case), *see id.* at 16–17;

> (3) A holdover proceeding may be commenced by a landlord seeking to clear an apartment because, *e.g.*, the landlord intends to use the apartment personally, or because the landlord seeks to demolish the entire building, *see id.* at 17;

> (4) Proceedings may be instituted as a means of harassment, or because of simple human error, *see id.* at 17.

Based on this evidence, a reasonable jury could conclude that the context which plaintiffs fault On-Site for omitting could have materially affected how landlords assessed their desirability as prospective tenants.

For these reasons, plaintiffs have adduced sufficient evidence that On-Site's reports were rendered materially misleading, and thus inaccurate, within the meaning of the FCRA by virtue of their omission of important mitigating information.

### iii.    Plaintiff/Defendant vs. Petitioner/Respondent

Plaintiffs separately claim that the On-Site reports were inaccurate because they referred to the parties in the Housing Court proceedings as "plaintiffs" and "defendants," as opposed to "petitioners" and "respondents."  *See* Pl. Br. 18.

 "Mere imprecision," however, is not tantamount to inaccuracy under the statute.  *Toliver*, 973 F. Supp. 2d at 715 (citing *Wagner*, 1998 WL 127812, at *1); *see also Williams-Steele v. Trans Union*, No. 12 Civ. 310 (GBD) (JCF), 2014 WL 1407670, at *4 (S.D.N.Y. Apr. 11, 2014) (incorrect contact information in credit report is not actionable), *report and recommendation adopted*, 2015 WL 576707 (S.D.N.Y. Feb. 10, 2015), *aff'd*, 2016 WL 1039672 (2d Cir. Mar. 16, 2016).  Here, the distinction between "plaintiff/defendant" and "petitioner/respondent" is too insignificant to give rise to cognizable inaccuracy under § 1681e(b).  Those terms do not convey any substantive information about a prospective tenant.  And plaintiffs offer nothing beyond unpersuasive speculation to suggest that a landlord's assessment of a prospective tenant would be affected by whether the tenant was described as a defendant or as a respondent.

Therefore, On-Site's use of the terms "plaintiff" and "defendant" does not render its reports inaccurate within the meaning of the FCRA.  Summary judgment as to this aspect of plaintiffs' claim must be granted for On-Site.

### iv.    Notices of Adverse Action

Finally, plaintiffs allege that "incorrect terms and misleading credit score[s]" appeared in the landlords' Notices of Adverse Action, which informed plaintiffs that their applications had been denied.  *See* Pl. Br. 21.  Plaintiffs argue that these notices are "false, deceptive, and misleading" because On-Site "automatically recommends to its customers that they reject any applicant who was named in a previous Housing Court proceeding, regardless of its outcome or nature."  SAC ¶ 90.

The undisputed evidence establishes, however, that the landlords—On-Site's clients—retain discretion as to what weight, if any, to assign to Housing Court records. They can set their preferences so that any Housing Court record results in an automatic "fail" (as each landlord did in this case); they can set their preferences to essentially ignore such records; or they can tolerate some but not all types of Housing Court records. *See* Joint 56.1, ¶¶ 147–64. Here, plaintiffs were rejected because their prospective landlords set their parameters for Housing Court records at "pass/fail." *Id.* ¶¶ 160–64. The Notices of Adverse Action accurately conveyed this fact.

Plaintiffs appear to seek a judicial determination that it violates the FCRA for a CRA to give a landlord the *option* of failing a prospective tenant on the basis of the tenant's having a Housing Court record. The Court is unaware of any legal authority for this claim. Moreover, factually, plaintiffs fail to adduce evidence that On-Site, as opposed to the prospective landlord, made the choice to disqualify them on that basis. With or without the options provided by On-Site, it would fall to the landlord whether to assign significance (and, if so, how much) to the fact that a prospective tenant had been involved in a Housing Court proceeding. Absent any evidence that the CRA caused the landlord to make this choice, a plaintiff's claim that such "blacklisting" is unlawful lies against, if anyone, the landlord. To the extent plaintiffs attempt to impose FCRA liability on On-Site based on the existence of a setting enabling the landlord to choose automatic disqualification of applicants with any Housing Court record, summary judgment must be granted for On-Site.

***

For these reasons, the Court holds that plaintiffs have adduced sufficient evidence to permit a jury to find that On-Site's use of the term "Forcible Entry/Detainer" and its omission of

mitigating information constituted inaccuracies within the meaning of the FCRA.  The Court

now turns to the other statutory elements.

### 2.      Reasonable Procedures to Assure Accuracy

#### a.      Legal Standards

The FCRA does not provide for strict liability for a CRA that reports inaccurate

information.  Rather, "the consumer must show that the agency failed to follow reasonable

procedures in generating the inaccurate report."  *Whelan*, 862 F. Supp. at 829 (citing *Cahlin*, 936

F.2d at 1156).  "The standard for evaluating the reasonableness of an agency's procedures is

'what a reasonably prudent person would do under the circumstances.'"  *Id.* at 831 (quoting

*Houston v. TRW Info. Servs., Inc.*, 707 F. Supp. 689, 693 (S.D.N.Y. 1989)).  Assessing

reasonableness generally requires "balancing the potential harm from inaccuracy against the

burden on the agency of safeguarding against such inaccuracy."  *Houston*, 707 F. Supp. at 693;

*see also Koropoulos*, 734 F.2d at 42 (recognizing need for a "balancing test"); *Childress*, 790

F.3d at 748 (assessing whether plaintiff's preferred procedure would be "a feasible task to lay

on" the credit agencies).  "Whether or not the credit reporting agency followed reasonable

procedures 'will be a jury question in the overwhelming majority of cases.'"  *Gorman*, 2008 WL

4934047, at *4 (quoting *Cahlin*, 936 F.2d at 1156); *see also Sarver v. Experian Info. Sols.*, 390

F.3d 969, 971 (7th Cir. 2004); *Cousin v. Trans Union Corp.*, 246 F.3d 359, 368 (5th Cir. 2001);

*McCauley v. Trans Union LLC*, No. 02 Civ. 4042 (VM), 2003 WL 22845741, at *2 (S.D.N.Y.

Nov. 26, 2003).

The case law reflects two diverging characterizations of the parties' respective burdens

on summary judgment.  The D.C. Circuit has held that a plaintiff "must minimally present some

evidence from which a trier of fact can infer that the consumer reporting agency failed to follow

reasonable procedures in preparing a credit report."  *Stewart*, 734 F.2d at 51.  But, that Circuit

has recognized, in some circumstances, "inaccurate credit reports by themselves can fairly be read as evidencing unreasonable procedures," *e.g.*, where a plaintiff's file contains internally inconsistent information. *Id.* The Ninth and Eleventh Circuits, in contrast, have adopted a more plaintiff-friendly approach in which a plaintiff's demonstration of inaccuracies shifts the onus to the defense: "[O]nce a plaintiff has demonstrated inaccuracies in the report, a defendant could prevail on summary judgment only if it were to produce evidence that demonstrates as a matter of law that the procedures it followed were reasonable." *Philbin v. Trans Union Corp.*, 101 F.3d 957, 965 (3d Cir. 1996) (interpreting *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333–34 (9th Cir. 1995); *Cahlin*, 936 F.2d at 1156).

Here, the outcome is the same under either approach. As to the reasonableness of On-Site's procedures resulting in the use of the term "Forcible Entry/Detainer" to describe New York City Housing Court proceedings, that question is properly left to the jury. As to the reasonableness of On-Site's decision not to supplement plaintiffs' reports with plaintiff-specific mitigating information, however, summary judgment must be granted for the defense, given plaintiffs' failure to present any evidence on which a jury could reliably find unreasonable On-Site's failure to harvest and present such information.

> b.     *Application*

> i.     *Reasonableness of Using Term "Forcible/Entry Detainer"*

On-Site principally defends its procedures —including those that led it to use the term "Forcible Entry/Detainer"—on the ground that it was inherently reasonable to rely on Lexis to provide On-Site with accurate records. *See* On-Site Br. 14–16; On-Site Reply Br. 12–13. On-Site argues that, because Lexis is a reputable vendor that gathers data by actually examining paper files in Housing Court, On-Site acted reasonably in reproducing Lexis's data "verbatim." On-Site Br. 15.

33

Plaintiffs counter by citing several pieces of evidence that, they argue, made it unreasonable for On-Site to reproduce, uncritically, Lexis's data regarding plaintiffs' "Forcible Entry/Detainer" cases in Housing Court.  First, plaintiffs note that, before joining On-Site, On-Site's "compliance officer,"[21] Eric Basart, worked as a paralegal for a law firm that represented landlords in eviction proceedings in New York City Housing Court, and in that capacity he prepared "holdover" and "nonpayment" petitions.  *See* Joint 56.1, ¶¶ 215–16.  Thus, plaintiffs argue, Basart must have been aware that no Housing Court proceeding can be accurately described as "Forcible Entry/Detainer."  *See* Pl. Br. 15.  Second, On-Site itself previously used the term "holdover" to describe the proceedings that it described here as "Forcible/Entry/ Detainer" proceedings; On-Site's 2009 switch to using Lexis to collect New York City Housing Court data led it to change this terminology.  *See* Joint 56.1, ¶¶ 217–18.  Third, On-Site was aware or should have been aware that Lexis intended to use the term at issue here:  Its 11-page contract with Lexis included a list of "Eviction Related Filing Types" that Lexis intended to use, which stated that Lexis planned to describe filings either as belonging to a "civil" case,[22] a "small claims" case,[23] or a "Forcible Entry/Detainer" case.[24]  *See* Scher Decl., Ex. HH, Sched. B.

In the Court's assessment, although the question is a close one, this evidence, viewed in combination, is sufficient to permit a reasonable jury to conclude that On-Site knew or should

---

[21] Basart's title is vice president of corporate development, but the accuracy of plaintiffs' characterization of him as On-Site's FCRA compliance officer is not disputed.  *See* Joint 56.1, ¶ 215.

[22] *E.g.*, "Civil New Filing," "Civil Dismissal," "Civil Judgment," and "Civil Judgment Release."

[23] *E.g.*, "Small Claims Judgment" and "Small Claims Judgment Release."

[24] *E.g.*, "Forcible Entry/Detainer" and "Forcible Entry/Detainer Release."  There was also an entry for "Vacated Judgment."

have known that the term "Forcible Entry/Detainer" was inaccurate as applied to New York City holdover proceedings, and that Lexis was nevertheless applying this term to such proceedings. Specifically, a jury could conclude that On-Site, through the firsthand experience of its compliance officer, was familiar with New York City Housing Court procedures and terminology, and was aware that in New York City the more innocuous *and* more accurate term "holdover" is used to describe proceedings resulting in judgments of possession for landlords. Moreover, a jury could find that On-Site itself had used this accurate term when it directly received data from the Office of Court Administration, the administrative arm of the New York State court system.  Yet On-Site chose a vendor that used a different term, and was on notice from its relatively brief contract with Lexis that Lexis intended to do so.  *See* Basart Dep. 37 (acknowledging that he may have learned at the time he saw the contract that Lexis intended to use the term "Forcible Entry/Detainer," but that he did not raise any questions about it).

Notwithstanding Lexis's concededly excellent reputation, On-Site was therefore arguably well-positioned to realize that the term Lexis employed had the potential to mislead On-Site's clients, particularly in New York City.  Yet On-Site has come forward with no evidence that it ever suggested that Lexis change this terminology; that it ever considered (before this lawsuit) changing the term itself; or that it even gave any thought to whether the term could result in material misunderstandings.  *See* Basart Dep. 59 (acknowledging that On-Site could have stopped using the term before this lawsuit was filed, but did not do so).

To be sure, a jury could alternatively find that it was reasonable for On-Site, at the outset of its relationship with Lexis, to accept categorically the labels used by this established, reputable vendor.  And a jury could find that it was reasonable, too, for On-Site thereafter to maintain this terminology, insofar as, until Wenning and Correa filed this lawsuit, On-Site had not received

35

any complaints about the "Forcible Entry/Detainer" formulation.  Joint 56.1, ¶ 145.  However, in light of the general presumption that reasonableness is a jury question, and given the contrary inferences that a rational jury could make from the assembled record as to whether On-Site used reasonable procedures to avoid inaccurately describing Housing Court proceedings like Wenning's and Correa's, the Court's judgment is that a jury, not the Court, should resolve the question of reasonableness.

In opposing this conclusion, On-Site relies on distinguishable authorities.  It emphasizes decisions holding that the FCRA "does not hold a reporting agency responsible where an item of information, received from a source that it reasonably believes is reputable, turns out to be inaccurate unless the agency receives notice of systemic problems with its procedures."  *Sarver*, 390 F.3d at 972; *see also Henson*, 29 F.3d at 285–86; *Ogbon*, 2013 WL 1430467, at *7.  But these cases involved the sort of unfortunate mix-ups that are endemic to a largely automated and computerized credit reporting system processing millions of updates every day.  *See Sarver*, 390 F.3d at 970 (different person with same name was responsible for account attributed to plaintiff); *Henson*, 29 F.3d at 282 (court clerk erroneously noted in the Judgment Docket that a money judgment had been entered against plaintiff, which defendant then reported); *Ogbon*, 2013 WL 1430467, at *7 (plaintiff's identity was stolen and identity thief incurred debts that were attributed to plaintiff).  The courts in those cases therefore were rightly concerned about construing the FCRA to compel CRAs to undertake onerous human review of presumptively trustworthy documents, such as court records.  *See Henson*, 29 F.3d at 285–86 ("Requiring credit reporting agencies to look beyond the face of every court document to find the rare case when a document incorrectly reports the result of the underlying action would be unduly burdensome and inefficient."); *Sarver*, 390 F.3d at 972 ("What Sarver is asking, then, is that each computer-

36

generated report be examined for anomalous information."); *see also Childress*, 790 F.3d at 747 ("What the plaintiff wants would thus require a live human being, with at least a little legal training, to review every bankruptcy dismissal and classify it as either voluntary or involuntary."); *Wright*, 805 F.3d at 1241 (CRAs not required to "employ individuals trained in American tax law to examine every [notice of federal tax lien] filed in a county recorder's office").

That fact pattern is not at issue here. Plaintiffs do not fault On-Site for failing to undertake a manual review of individual court files. (To On-Site's credit, such a review, in fact, was undertaken by its vendor, Lexis.) Plaintiffs instead fault On-Site for using a term that misleadingly suggested that a category of landlord-tenant actions involved "forcible entry" when they did not. Plaintiffs do not seek to require On-Site to conduct a manual, needle-in-a-haystack review of case files to confirm factual accuracy. Rather, plaintiffs' quarrel is with the global use of a term that, plaintiffs claim, is inherently inaccurate at least as to New York City Housing Court. And it is relevant to the reasonableness inquiry that the market in question is New York City. According to plaintiffs' expert, New York City has the highest volume of eviction cases of any city in the country—some 240,000 were filed in 2014, *see* Scherer Report 11—and On-Site issues "thousands" of reports to New York City customers every year. Basart Dep. 26. Under such circumstances, a jury could fairly conclude that it was reasonable to expect On-Site to give a degree of attention to whether the labels it applied in this large market were or were not categorically inaccurate. While a jury *could* balance the relevant burdens and benefits so as to favor On-Site's decision to defer categorically to Lexis's terminology, it is rightly the jury's role to make that determination.

Therefore, the Court holds, plaintiffs have produced sufficient evidence to reach the jury on the question whether On-Site employed reasonable procedures in replicating Lexis's terminology rather than using the more localized lexicon with which On-Site was familiar.

                    ii.      *Reasonableness of Omitting Mitigating Information*

On-Site's failure to provide mitigating information about plaintiffs presents a different issue.  Plaintiffs' claim that On-Site had a duty to supplement its reports with more specific information about plaintiffs' Housing Court cases is closely akin to the claims of unreasonableness rejected in *Sarver*, *Henson*, and similar cases discussed above.

To be sure, plaintiffs could have adduced evidence that it was practical and economically rational for Lexis (and, by extension, On-Site) to extract case-specific mitigating information from each plaintiff's Housing Court files.  But plaintiffs have not come forward with any such evidence; plaintiffs merely declare that On-Site should have supplemented the data in its reports, with no attention given to the cost side of the equation.  *See* On-Site Reply Br. 14 n.10.  In fact, the Court (in resolving a discovery dispute) recognized the need, under the FCRA, to balance "the expense and efficacy of [obtaining additional information] relative to On–Site's ability to pay."  *See* Dkt. 47, *reported at Wenning v. On-Site Manager, Inc.*, 141 F. Supp. 3d 256, 258 (S.D.N.Y. 2015).  Plaintiffs' failure to adduce such evidence, or indeed to engage in any evidence-based evaluation of the practicality and cost of requiring such supplementation, prevents them from reaching a jury on the question of reasonableness.

                                        ***

Thus, of plaintiffs' claims, only the claim relating to On-Site's use of the term "Forcible Entry/Detainer" to describe New York City Housing Court proceedings satisfies the first two elements of an FCRA negligence claim.  The Court proceeds to consider whether plaintiffs have

38

produced sufficient evidence regarding damages and causation to survive summary judgment on their "Forcible Entry/Detainer" claim.

### 3. Damages

Plaintiffs seek only emotional damages allegedly caused by On-Site's use of the term "Forcible Entry/Detainer" to describe their prior Housing Court cases. Crucially, plaintiffs no longer pursue damages arising from the denial of their rental applications, although the SAC identified such damages. *See* SAC ¶ 99(a); Scher Decl., Ex. GG; Tr. 6–7. Plaintiffs' abandonment of these damages appears to reflect a recognition that the denial of their rental applications was not caused by On-Site's use of the term "Forcible Entry/Detainer," but by the landlords setting their screening criteria to automatically "fail" any prospective tenant with a Housing Court history. *See id.* at 3–7 (colloquy between Court and counsel on element of causation). In other words, there is no evidence that the term "Forcible Entry/Detainer"—as opposed to the fact that plaintiffs had *any* Housing Court record, however described—led Wenning's and Correa's prospective landlords to deny their applications.

Therefore, the Court addresses only whether plaintiffs have adduced sufficient evidence of emotional damages to reach a jury.

#### a. Legal Standards for Emotional Damages Under FCRA

Emotional damages are recoverable in FCRA actions, even in the absence of out-of-pocket expenses. *See Casella*, 56 F.3d at 474. Such damages often arise from the denial of credit or a similarly adverse action brought about by an inaccuracy in a credit report. *See, e.g.*, *Pinner*, 805 F.2d at 1265 ("Pinner testified that he was embarrassed and humiliated about the credit denials from several retail stores."). But emotional damages may also be freestanding; where an inaccuracy *alone* causes emotional damages, plaintiffs may still recover under the FCRA. *See Guimond*, 45 F.3d at 1333 ("[N]o case has held that a denial of credit is a

prerequisite to recovery under the FCRA."); *Dalton*, 257 F.3d at 418 ("[Plaintiff] need only show that he suffered damages from the false report, regardless of how [a prospective employer] reacted to the report.").

The Second Circuit's decision in *Casella*, on which On-Site relies, is not to the contrary, although it does limit the circumstances under which emotional damages may be available on a freestanding basis.  In *Casella*, the plaintiff's claim "boil[ed] down to the bare contention that he is entitled to damages for pain and suffering simply because he *knew* of an inaccurate and potentially damaging item in his credit report."  56 F.3d at 475.  The Circuit held that a plaintiff cannot recover emotional damages "when he has failed to show that any creditor or other person ever learned of the derogatory information from a credit reporting agency."  *Id.*; *see also Trikas v. Universal Card Servs. Corp.*, 351 F. Supp. 2d 37, 45 (E.D.N.Y. 2005).  After *Casella*, district courts in this Circuit have continued to hold that "a plaintiff can establish damages when there was no credit denial, as long as they can provide [sic] that creditors became aware of the inaccurate information."  *Caltabiano v. BSB Bank & Trust Co.*, 387 F. Supp. 2d 135, 141 (E.D.N.Y. 2005); *see also Jones v. Experian Info. Sols., Inc.*, 982 F. Supp. 2d 268, 276 (S.D.N.Y. 2013) ("Courts have held that actual damages, in the form of pain and suffering, are not available unless the CRA improperly discloses the credit report."); *McMillan v. Experian*, 170 F. Supp. 2d 278, 286 n.10 (D. Conn. 2001) ("*Casella* does not itself *require* a denial of credit to make out a FCRA violation.").

Nevertheless, *Casella* underscores that a credit denial or similarly adverse event will often be what enables a plaintiff to establish bona fide emotional damages.  *See* 56 F.3d at 475 (citing, *inter alia*, *Stevenson v. TRW, Inc.*, 987 F.2d 288, 297 (5th Cir. 1993) (plaintiff was denied credit three times and experienced considerable embarrassment from discussing his

40

problems with business associates and creditors); *Pinner*, 805 F.2d at 1265 (embarrassment

resulting from three credit denials and lengthy dealings with credit bureau)); *see also Bach v.

First Union Nat. Bank*, 149 F. App'x 354, 361–62 (6th Cir. 2005) (denial of mortgage

application, which would have enabled plaintiff's granddaughter to easily care for her, made her

feel ashamed and embarrassed).  The case law further reflects that a plaintiff's emotional injury

claim is more likely to survive summary judgment where it is detailed, objective, and

corroborated.  Some cases, in fact, have required third-party corroboration, holding that a

plaintiff's "conclusory," "unsupported," and "subjective" testimony on emotional damages is

insufficient as a matter of law.  *See Neclerio v. Trans Union, LLC*, 983 F. Supp. 2d 199, 215 (D.

Conn. 2013) ("conclusory"); *Okocha v. HSBC Bank USA, N.A.*, No. 08 Civ. 8650 (MHP), 2010

WL 5122614, at *6 (S.D.N.Y. Dec. 14, 2010) ("conclusory"); *Burns v. Bank of Am.*, 655 F.

Supp. 2d 240, 251 (S.D.N.Y. 2008) ("unsupported"); *Caltabiano*, 387 F. Supp. 2d at 142

("subjective").  Other courts, however, have not categorically required corroboration, and the

Court holds that there is no statutory basis to categorically require third-party corroboration to

permit a claim for emotional damages to reach the jury.  *See Cortez v. Trans Union, LLC*, 617

F.3d 688, 720 (3d Cir. 2010) ("[C]orroboration goes only to the weight of evidence of injury, not

the existence of it."); *McMillan*, 170 F. Supp. 2d at 287.

A plaintiff's emotional damages must, however, be "demonstrable," as otherwise there is

a risk that claims for emotional distress will be "fictitious and trivial."  *Robinson v. Equifax Info.

Servs., LLC*, 560 F.3d 235, 241 (4th Cir. 2009) (quoting *Sloane v. Equifax Info. Servs., LLC*, 510

F.3d 495, 503 (4th Cir. 2007)).  Plaintiffs who rely on their own testimony must "explain their

injury in reasonable detail and not rely on conclusory statements."  *Llewellyn v. Allstate Home

Loans, Inc.*, 711 F.3d 1173, 1182 (10th Cir. 2013) (quoting *Bagby v. Experian Info. Sols., Inc.*,

41

162 F. App'x 600, 605 (7th Cir. 2006)) (alteration omitted).  As the assembled case law reflects, various factors may bear on whether a claim of emotional injury is sufficiently demonstrable to reach a jury—including whether there is corroborative testimony or other objective evidence, *e.g.*, medical records; whether plaintiff's testimony is conclusory or detailed; whether plaintiff's asserted distress was short-lived or long-lasting;[25] and whether the emotional distress is linked to a credit denial or similarly adverse event.[26]  Additionally, some forms of inaccuracies on credit reports may be "so inherently degrading that a jury could infer the existence of emotional distress." *Wantz v. Experian Info. Sols.*, 386 F.3d 829, 834 (7th Cir. 2004), *abrogated on other grounds by Safeco*, 551 U.S. 47.

b.    *Application*

Plaintiffs' emotional-damages claims clear the initial bar set by *Casella*:  As to each plaintiff, there is evidence that a prospective landlord learned of the inaccurate information, even if the inaccuracy did not ultimately cause any adverse action.  *See Casella*, 56 F.3d at 475.  But a closer examination of each plaintiff's deposition testimony—the only evidence that either plaintiff has offered on emotional damages—is necessary to determine whether that evidence is sufficient to survive summary judgment.

---

[25] *Compare, e.g.*, *Cortez*, 617 F.3d at 719 (describing "two-year ordeal," corroborated by plaintiff's daughter), *with Taylor*, 710 F.3d at 829 ("[C]orroboration of a brief episode of frustration and unhappiness does not establish the sort of concrete emotional distress that is required to constitute a genuine injury and actual damages.").

[26] In the related context of considering the potential excessiveness of an award for emotional distress, the Fourth Circuit considers "the factual context in which the emotional distress arose; evidence corroborating the testimony of the plaintiff; the nexus between the conduct of the defendant and the emotional distress; the degree of such mental distress; mitigating circumstances, if any; physical injuries suffered due to the emotional distress; medical attention resulting from the emotional duress; psychiatric or psychological treatment; and the loss of income, if any."  *Sloane*, 510 F.3d at 503.

i.     *Wenning*

Wenning testified repeatedly that hearing the term "Forcible Entry/Detainer" made her feel like she was being called a criminal.  *See* Wenning Dep. 55–57, 59, 82, 129, 145.  She was humiliated, surprised, and "unglued."  *Id.* at 82.  When the Common Ground caseworker first told her that her application would be denied, Wenning testified, she "cried hysterically."  *Id.* at 83.

This distressed condition, however, did not last long.  Wenning promptly retained counsel, who, working with On-Site and Wenning's former landlord, secured the removal of the offending phrase from her On-Site report.  One week after Wenning first learned of the problem, On-Site generated an amended report.  Less than a week after that—13 days after Wenning's application was denied—Wenning was approved for an apartment at Gotham West.  Her diligence and resourcefulness—and that of her counsel—averted what could have been longer-lasting harm.

Under the FCRA, however, the alacrity with which Wenning obtained a corrected On-Site report hurts her claim for emotional damages.  The stressor—the errant description of Wenning's Housing Court proceeding as a "Forcible Entry/Detainer" case—persisted for only a week after Wenning learned of it.  To be sure, this episode was longer-lived than the five-to-10-minute period that the Eighth Circuit held insufficient to establish genuine emotional damages.  *Taylor*, 710 F.3d at 829.  But Wenning's experience was far closer to *Taylor* than to the "two-year ordeal" that the Third Circuit held sufficient.  *See Cortez*, 617 F.3d at 719; *see also Guimond*, 45 F.3d at 1332 (some seven months passed between republication of erroneous information and eventual removal from plaintiff's file); *Sloane*, 510 F.3d at 503 (plaintiff spent 21 months attempting to correct defendant's errors).  The short time that Wenning was aware of the errant report militates against her claim of demonstrable emotional injury.

43

Significant, too, is the fact that On-Site's description achieved little circulation known to Wenning.  Wenning learned of the report from a sympathetic supporter at Common Ground; it is not clear whether anyone at Gotham West knew about the report.  (And, of course, Wenning disclosed the report to the counsel she retained.)  And the errant account of her Housing Court case was not so inherently degrading as to make a resulting emotional injury obvious or inevitable.  The On-Site report did not say anything about Wenning personally.  It did not report a criminal record or a credit delinquency.  At most, it described her case as one that resulted, for reasons unspecified, in a forceful eviction.  The Court does not doubt that such a label—and the speculation it invites as to reasons behind the eviction—can cause emotional distress.  But the assembled case law suggests that, without other objective consequences, the duration of the offending report and/or the level of publicity it generated would have to be greater to give rise to claim for emotional damages worthy of jury consideration.

In addition, although the Court has held that third-party corroboration is not required, the case law has considered that factor in evaluating whether the claimed distress was demonstrable enough to reach a jury.  *See Taylor*, 710 F.3d at 829 (third party witnessed plaintiff crying); *Cortez*, 617 F.3d at 719 (plaintiff's daughter testified that plaintiff was "under extreme stress," "cried often and lost weight," and "discussed her concerns about her credit report every time they spoke"); *Robinson*, 560 F.3d at 241 (plaintiff's family and friends "painted a detailed picture of her ongoing struggles with Equifax and the emotional toll").  Here, Wenning has not pointed to any corroboration whatsoever of her claim of emotional injury.  Wenning did testify that she would have seen a therapist if she could have afforded one, but she could not.  *See* Wenning Dep. 143–46.  She also did not come forward with any lay outcry witness (*e.g.*, a friend, family member, co-worker, or neighbor) to support her claim of contemporaneous distress.

44

Finally, because Wenning no longer maintains (and could not maintain) that the denial of her application was caused specifically by the term "Forcible Entry/Detainer," her claim for emotional damages is not buttressed by any connection to an objective adverse event akin to a denial of credit.

Considering these factors in combination and in light of the case law, the Court holds that Wenning has not produced sufficient evidence of emotional distress for a reasonable jury to award such damages.  As nominal damages are not available for FCRA negligence claims, *see Cousin*, 246 F.3d at 371 n.19; *Davenport v. Sallie Mae, Inc.*, 124 F. Supp. 3d 574, 581 (D. Md.), *aff'd*, 623 F. App'x 94 (4th Cir. 2015) (per curiam), Wenning cannot establish the required element of damages.  On-Site's motion for summary judgment on Wenning's negligence claim must, therefore, be granted.

### ii.     Correa

Correa's testimony as to his emotional distress is roughly similar to Wenning's.  He testified that the term "Forcible Entry/Detainer" connoted that he had done something illegal, and that this "scared" him.  Correa Dep. 129.  He, too, testified that the denial of his application was shocking, depressing, and humiliating.  *See id.* at 81–84.  More distinctively, Correa testified that he was particularly concerned by the report's implication that he was dishonest, because he is a professional journalist.  *See id.* at 51–52, 82.  Finally, Correa testified, the years following the application denial were "a nightmare"—he has moved repeatedly and, because of stress, lost weight, started losing his hair, and almost lost his voice.  *See id.* at 132.

Because of the duration of Correa's claimed distress, the distinctive harm that he felt to his reputation as a journalist, and the physical manifestations of his suffering, the Court holds that he has produced sufficient evidence on which a jury could award emotional damages.

The Court therefore proceeds to address the element of causation as to Correa only.  The issue is whether Correa's emotional injury is attributable to the use of the term "Forcible Entry/Detainer" in his On-Site report or to the rejection of his rental application, which was not a product of any inaccuracy in that report.

### 4.    Causation

#### a.    Legal Standards

Causation is a necessary element of an award of actual damages in an FCRA negligence claim.  *See Casella*, 56 F.3d at 474–75.  Courts do not appear to have settled on terminology to describe the degree of causation that is necessary.  In *Casella*, the Second Circuit cited one case using the concept of proximate causation and another using the term "causal factor."  *See id.* at 475 (citing, respectively, *Hauser v. Equifax, Inc.*, 602 F.2d 811, 816 (8th Cir. 1979), and *Cahlin*, 936 F.2d at 1161); *see also Crabill v. Trans Union, L.L.C.*, 259 F.3d 662, 664 (7th Cir. 2001) ("causal relation" and "causal connection"); *Philbin*, 101 F.3d at 969 ("substantial factor"); *Gorman*, 2008 WL 4934047, at *6 ("substantial factor"); *Whelan*, 862 F. Supp. at 829 ("proximate[] cause[]"); *Lewis v. Ohio Prof'l Elec. Network LLC*, 248 F. Supp. 2d 693, 701 (S.D. Ohio 2003) ("causal link").  It is not clear how, if at all, these standards might differ from one another in the FCRA context.

What *is* clear, however, is that any harm must be traceable to the inaccurate, FCRA-violating information—not just to the report that contained that information or to accurate data within the same report.  *See Casella*, 56 F.3d at 474–75 (noting need for "causation between the harm alleged by [plaintiff] and [defendants'] alleged violations of the FCRA"); *Philbin*, 101 F.3d at 969 (plaintiff must produce evidence that "the inaccurate information was a substantial factor in bringing about the denial of credit"); *Crabill*, 259 F.3d at 664 (requiring "causal relation

between the violation of the statute and the loss of credit"); *Gorman*, 2008 WL 4934047, at *6 ("[T]he inaccuracy in the credit report must proximately cause actual damages to plaintiff.").

> ### b.   Application

Correa's claim for emotional damages fails this last test.  Unlike Wenning, who specifically testified that the term "Forcible Entry/Detainer" was what caused her emotional pain, Correa testified only that he was hurt by the denial of his rental application, not by that term specifically.  *See* Correa Dep. 81 (tracing his "shock[]" to the fact he had been "blacklisted"); *id.* at 83 (recognizing that his application was denied because "they don't want to see my name in the [Housing Court] record," not because of the offending term).[27]  This testimony does not avail Correa, because, as is undisputed, his rental applications were denied not because of On-Site's terminology or any inaccuracy in its reports, but because it *accurately* reported that Correa had been involved in a Housing Court proceeding.

To be sure, Correa testified that he was "scared" when he read the term "Forcible Entry/Detainer" because it suggested that he "did something against the law, that [he] forced something."  *Id.* at 129.  But Correa's bare and conclusory testimony that he felt "scared" for an unspecified amount of time is insufficient to support emotional damages.  *See Taylor*, 710 F.3d at 829 (plaintiff's testimony that she was "extremely upset and embarrassed" was insufficient); *Cousin*, 246 F.3d at 371 (plaintiff testified he felt "very upset [and] angry"); *Neclerio*, 983 F.

---

[27] Later in his deposition, Correa testified that the "nightmare" he has experienced for "almost three years" is traceable to the fact that "somebody use[d] the wrong terms."  Correa Dep. 132. This could be read to suggest that Correa blames the use of the term "Forcible Entry/Detainer" for the "nightmare" he describes, including moving frequently, losing possessions, losing weight, losing hair, and losing his voice.  *Id.*  In context, however, the only plausible reading of Correa's deposition testimony is that his "nightmare" was caused by the denial of the rental application, not by On-Site's use of the term "Forcible Entry/Detainer" itself.  To the extent Correa blends these issues—suggesting that the term is to blame for the landlord's denial of his application— his testimony is definitively undercut by undisputed evidence as to the cause of the denial.

Supp. 2d at 214 (plaintiff testified that he felt "powerless," "frustrated," and increased "pressure").

Thus, while Correa does describe demonstrable emotional distress, he does not describe distress that is causally connected to the sole actionable FCRA violation supported by the record.

### C.    Willfulness Claim

Plaintiffs separately claim that On-Site willfully failed to employ reasonable procedures to assure accuracy, in violation of 15 U.S.C. § 1681n.  Under that provision, a willful violation of the FCRA results in liability for (1) actual damages *or* statutory damages between $100 and $1,000; (2) punitive damages; and (3) costs.  Thus, unlike with negligence claims, actual damages and causation are not elements of a willfulness claim.  The elements of a willfulness claim under 15 U.S.C. § 1681e(b) are (1) inaccuracy and (2) a failure to follow reasonable procedures that is (3) reckless or knowing.  *See Safeco*, 551 U.S. at 57–58.  The Court has found that there is adequate evidence to establish the first two elements with respect to plaintiffs' claim based on On-Site's use of the "Forcible Entry/Detainer" term.  The Court now considers whether there is sufficient evidence of reckless or knowing conduct in connection with On-Site's use of that term.

#### a.    Legal Standards

Willfulness under the FCRA entails "reckless disregard of statutory duty."  *Id.* at 57.  An "erroneous" interpretation of the FCRA is not "reckless" unless it is "objectively unreasonable." *Jones v. Halstead Mgmt. Co., LLC*, 81 F. Supp. 3d 324, 333 (S.D.N.Y. 2015) (quoting *Safeco*, 551 U.S. at 69).  A reckless action entails "an unjustifiably high risk of harm that is either known or so obvious that it should be known."  *Safeco*, 551 U.S. at 68 (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)).

As a general matter, courts have granted summary judgment to CRAs on willfulness claims when plaintiffs do not produce evidence that, after the CRA learned that its report was inaccurate, it failed to fix it. *See Houston*, 707 F. Supp. at 694 ("Once it confirmed that the public record was in error, [defendant] deleted the reference to the 1983 judgment against [plaintiff]."). Courts have also granted summary judgment to CRAs when there is no evidence of prior complaints about the problem on which plaintiffs' claim is based. *See Whelan*, 862 F. Supp. at 833–34 ("[T]here can be no question that Trans Union acted with the requisite [willfulness] given that it was not even put on notice that its report contained inaccurate information until [the filing of the lawsuit.]"). The Fourth Circuit's decision in *Dalton* is illustrative. The Circuit found that the plaintiff had adduced sufficient evidence of negligence, but did not find willfulness, for reasons including the absence of evidence of other consumer complaints similar to plaintiff's, the fact that the CRA had found reliable the firm it tasked with doing criminal background investigations, and the fact that the CRA corrected its mistake one day after plaintiff raised it. *See Dalton*, 257 F.3d at 417–18.

### b.   Application

Before this case was filed, On-Site had not received any complaints about its use of the term "Forcible Entry/Detainer." Joint. 56.1, ¶ 145. Shortly after this lawsuit was filed, On-Site changed the term it uses to "Civil Action for Possession." *Id.* ¶ 146. Under *Dalton*, these facts strongly counsel against a finding of willfulness. Plaintiffs have come forward with evidence on which a negligence claim could rest—to wit, evidence that On-Site should have known that it could be inaccurate to use "Forcible Entry/Detainer" to describe New York City Housing Court records—but they have not identified any evidence that On-Site *actually* knew that such usage

was inaccurate or that On-Site subjectively appreciated the risk of inaccuracy.  On plaintiffs'

willfulness claim, summary judgment must therefore be granted to On-Site.

### D.     NYGBL § 349 Claim

A claim under New York General Business Law § 349 requires that "a defendant has

engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff

suffered injury as a result of the allegedly deceptive act or practice."  *Orlander v. Staples, Inc.*,

802 F.3d 289, 300 (2d Cir. 2015) (quoting *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940,

941 (2012)) (internal quotation marks omitted).

Plaintiffs' inability to establish unreasonableness (as to their omissions-related claim) and

damages/causation (as to their "Forcible Entry/Detainer" claim) are together fatal to their

NYGBL § 349 cause of action.  *See Trikas*, 351 F. Supp. 2d at 46 ("Because Plaintiff has failed

to prove any harm, which precluded any recovery for negligent violation of the FCRA, [the

§ 349] claim must also be dismissed.")[28]; *Podell v. Citicorp Diners Club, Inc.*, 914 F. Supp.

1025, 1036 n.3 (S.D.N.Y. 1996), *aff'd*, 112 F.3d 98 (2d Cir. 1997) ("[P]laintiff's inability as a

matter of law to show the defendants were negligent [under the FCRA] also destroys any basis

for [a § 349 claim].").

Therefore, summary judgment must be granted to On-Site on plaintiffs' § 349 claim.

### CONCLUSION

For these reasons, the Court grants On-Site's motion for summary judgment and denies

plaintiffs' motion for partial summary judgment.  The Clerk of Court is respectfully directed to

close the motions pending at docket numbers 69 and 78, and to close this case.

---

[28] Plaintiffs have not cited any case holding that the standard for actual damages under § 349 is
lower than under the FCRA.

50

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: June 22, 2016
       New York, New York